1997 Laboratory Corporation of America v. Metabolite Labs Prepare whenever you're ready May it please the court, LabCorp's red brief in this case states the question presented as, quote, whether the district court correctly held that Metabolite chose to terminate the party's license agreement. That question is wrong in both of its parts. Let me take them in order, your honors. First, the district court did not hold that Metabolite terminated the know-how agreement. The court's actual holding, and this is a direct quote from page 28 in the appendix of the opinion, was that LabCorp's material breach of the license agreement by switching to the Abbott test terminated all licenses associated with the homocysteine test. You seem just to be fixing on some language which is not very precise. The fact is that you proceeded in the first trial on the theory that there had been a material breach and that this entitled you to terminate the homocysteine license at least with respect to the patent license, correct? Correct, Judge Dike, and it's important to note that there are two licenses and two license holders. My client, Metabolite, does not hold the patent license. The patent is owned by CTI, a separate company. CTI's patent rights certainly are separate from Metabolite's license rights. CTI took the position that LabCorp's switch to the Abbott test constituted a termination of the license agreement. That is, it lifted the protections of the license agreement so that LabCorp could be sued for patent. You're making the same mistake that you accused the district court of making. It's not that LabCorp terminated the agreement. It's that the patent holder elected to treat the agreement as terminated because of the breach. Your Honor, the patent holder elected to sue for patent infringement when LabCorp asserted— Which essentially resulted in a termination of the license. When LabCorp asserted the defense of license, the patent holder's response was that the license had been terminated by the breach as to the patent. So there was an election to terminate the license. By CTI. What you're saying is that at the same time, you didn't treat the know-how license as having been terminated. Absolutely right, Your Honor. How do we know that that was your theory in the case? How do we know that there was an effort to separate a termination of the patent license from a termination of the know-how license? Your Honor, throughout the first trial, those two licenses were very clearly separated. If you look, for example, at the final pretrial order in the first case, which is in the appendix here, where it has the statement of CTIs and metabolized positions, it goes very carefully through the separation between the patent license and the know-how license. Well, I understand that. But what statement did metabolite make that would lead one to think that it was only asserting a termination of the patent license as opposed to the know-how license? Your Honor, that was the theory on which the first case was tried. That's in the final instruction number two to the jury. That's in the pre-trial order. Where do I find a statement that you were not treating the know-how license as having been terminated? Your Honor, that issue was not expressed that expressly because the know-how license was not addressed in that sense. The know-how license has a separate termination clause that was not litigated because it was not put in issue at the first trial. I don't understand what the termination clause has to do with this. This is not a right being exercised under the termination clause. It's a right being exercised, an ordinary right of a non-defaulting party to treat the contract or part of the contract as being terminated. Your Honor, Metabolite's right under the know-how license to treat the breach as a termination goes to the entire agreement. Under New Jersey law and under section 4.03 of the contract, Metabolite has an on-off switch. It can either continue performance of the contract upon breach or it can terminate the entire agreement. But it purported not to terminate the entire agreement. It purported to terminate the patent license. Your Honor, it did not. CTI is the patent holder. Metabolite is not the patent holder. CTI elected to terminate part of this agreement. CTI elected to characterize the breach as a wrongful and partial termination of the patent agreement. And the patent agreement extended to other patents too, right? Yes, Your Honor. So it said, we're not going to terminate the entire agreement with respect to patent license. We're only terminating it with respect to the homocysteine. And when CTI terminates the agreement, all of the patents, including the sublicense, in terms of the letter agreement between these parties, go up to the CTI level. CTI has no authority to terminate or affect the Metabolite license agreement, which is the issue in this case. That license agreement is not CTI's agreement. That is Metabolite's agreement. And with respect to that agreement, the only one now at issue, there is a termination provision. It allows termination in three circumstances. Expiration of the last patent, termination by LabCorp on stated conditions. The question is not whether LabCorp terminated it. The question is whether the way you proceeded in the first case was an effective termination of the agreement. You were suing for breach damages instead of suing to enforce the agreement. Your Honor, CTI sued for patent infringement. Metabolite sued for breach of contract. The jury found both of those things. This party, if the termination had taken place in 1998 upon switching to the Abbott test, that would have relieved it of any royalty obligation after that date. Well, I understand that. But the trouble is the way the jury instructions read, it looks as though the jury is supposed to make a determination as to whether there was a termination. If it determines that there was not a termination, then it's supposed to award the license fees. If it decides that there was a termination, it's supposed to award breach damages. It said there has been a termination, and it awarded breach damages. Your Honor, the determination question put to the jury was whether the LabCorp was licensed under the patent and whether that license, quote, that license was terminated. Because that's the route to patent infringement damages. That question was not necessary to the breach of contract damages. By the end of this trial, it was absolutely clear to everybody that the contract had been breached. The only question was whether the patent license had separately been terminated. And again, there were always two licenses here. I point the court to final instruction number two that made that clear to the jury before they went to hear. And the language, special verdict number one, was LabCorp licensed under the patent, and was that license terminated? And then again, question five, the one that LabCorp quotes over and over again, did LabCorp breach the license agreement by terminating it? Now, they always stop the quote there, but it's not there. By terminating it with respect to its performance of the AVID test. It is absolutely true under patent law that a party's adoption of an infringing alternative gives the patent holder the absolute right to terminate that portion of the patent license that goes to the infringing activity. It is absolutely not true that that gives an equivalent right to a contract license holder, a state law license holder, the right to partially terminate. The metabolites right to terminate has always been governed by the terms of this license agreement. Metabolites right to terminate upon the breach required a termination of the entire contract. Counsel, can I move you to the jurisdiction issue? You off the merits. So under Christensen versus Colt, or Franchise Tax Court, or our speed code decision, what is the substantial question of dispute, in dispute between the parties regarding patent law? Your Honor, LabCorp's complaint asserted that it was not obligated to pay royalties because these were not licensed assays. It asserted two grounds for that argument. First, that the license agreement had terminated, and second, that the assays that it does perform were not within the scope of the patent. Are you talking about way, way, way early on? No, Your Honor, until 2007, July of 2007, when this patent expired. Let me quote, Your Honor, from the final pretrial order, A22088. LabCorp's position was, quote, the assays at issue in this case are not licensed assays for a variety of reasons, including the fact that they do not fall within a claim of the 658 patent. That was LabCorp's position. LabCorp directly put in issue the patent law question because licensed assays are defined in the agreement as, for homocysteine, assays that are covered by 658. What about the statement on A22095, which is a final pretrial order saying for the record that, as for the first rationale, a 658 patent has no bearing on this case? This is not a patent infringement case or even a patent license case. It is a case for breach of LabCorp's obligations to pay no royalties in consideration of a know-how license. That's a recitation, Your Honor, of Metabolite's defense. We took the position and still take the position that the fact that these assays are covered by the patent can't be disputed because the judgment of the first case is that these assays are covered by the patent. But that's an issue that's already been decided. Absolutely right. So that's an infringement issue. So that's decided. Now we get to the contract issue. Your Honor, LabCorp put this in issue. It's a bad issue. It never was a good issue, but they challenged this in their complaint and in the pretrial order that they were not covered because they took it out. They have this theory that the outsourced assays are somehow different than the in-house Abbott assays. Again, it's not a good theory, but it's a patent-based theory. You agree at this point there is no dispute between the parties over whether or not these assays are covered by the patent? In this court, in an attempt to deprive the court of jurisdiction, LabCorp now concedes the issue that it put in issue in the district court. That's correct. There are plenty of cases that suggest the mere fact that an issue is undisputed by the time that it gets here doesn't determine whether there was jurisdiction in the first place. That's correct, Your Honor. The jurisdiction should be resolved in the pleadings, and in the pleadings, LabCorp elected to take the position that its conduct by outsourcing the assay did not violate the patent or did not make those a licensed assay. And again, if the court were to conclude that that's not sufficient, and this is a follow-on case that we brought back here for that reason, the remedy would be to transfer it to the Tenth Circuit, where we'd have to go through all of this again. There's been no suggestion by LabCorp that it was brought to this court in bad faith. And in fact, given the heavy reliance by both LabCorp and the district court on some language from this court's prior opinion, that's why Metabolite made the determination that coming back here, based on the pleadings and the involvement of the prior opinion, was appropriate. This court is the ultimate arbiter, of course, of its jurisdiction, but we would submit that if the court were to conclude that it does not have jurisdiction, transfers the appropriate remedy. But there's no issue as to infringement, is there? The infringement issue is decided already. The infringement issue is decided. So we're not going to cover the infringement. Your Honor, in the license agreement, licensed assays for homocysteine are defined by reference to the claims of the 658 patent, so that the royalty payments under the state law license depend on the coverage of a claim of the 658 patent. That's how the patent issue, while it's not an infringement case, is directly at issue the way LabCorp pleaded its declaratory judgment complaint in this action. But there's no issue on infringement before us. That's correct, Your Honor. In this court, LabCorp agrees that it conducted an infringing activity. It agrees that if the license did not terminate, it would owe us royalties from the date of the judgment through August 21, 2007, when it finally sent a termination letter that complies with Section 4.02 of the contract, plus 60 days according to the license agreement. The question then becomes termination. I guess I'm confused how this can be a substantial disputed question of patent law when our court already resolved it. So regardless of what they put in their pleadings, I don't see how that could amount to a substantial disputed question of patent law. Judge Moore, two answers. One is they had this new theory that the outsourcing was somehow not covered by the court's prior opinion. We think that's wrong. The district court thought that was wrong, but that was their theory. Second, the Supreme Court's jurisdictional cases make clear that a substantial question of federal law is simply one that has to be decided by the court. It's not that it has to be won by the party asserted. I would certainly agree with the court's suggestion that the patent law issue in this case has always been a bad one after the court's prior decision. That does not make it insubstantial within the meaning of the jurisdictional statute. LabCorp presented as a ground for decision whether this was a licensed asset. They are licensed assets. The royalties are due. And then, as I said, the only question becomes termination. On termination, LabCorp doesn't defend the district court's judgment on its own terms, this notion that LabCorp terminated it, because it's clear that they didn't comply with 4.02. And then one final point, Your Honors. This assay, homocysteine, can be performed on both serum and urine. Until August of 2007, LabCorp continued to conduct the assays on urine and continued to pay royalties. Either this contract was terminated, even if there's a partial termination bill, either it was terminated for homocysteine or it wasn't. LabCorp's own conduct, its quarterly payment, quarter after quarter after quarter after quarter after quarter, of the royalties on the urine-based homocysteine assays, destroys the suggestion that the contract was terminated for all homocysteine assays. LabCorp concedes in its brief at page 37 that this contract at most allows for termination on an assay by assay basis and quote, the rights granted by the license agreement can't be divided any other way. So if the homocysteine assay was not terminated for urine and the undisputed facts show that it was not, the undisputed evidence, A20954 is the record citation, Your Honors, show that LabCorp has continued to pay on urine. That means no termination, that means they owe on serum. What does LabCorp have to say about this? I can simply reflect an agreement between the parties to treat the contract as reinstated with respect to the urine. Your Honor, it reflects a consistent course of conduct that neither party has ever treated this contract as terminated with respect to urine and nothing in the contract allows a partial termination. But that's not the question. The question is not what the contract allows. The question is whether as a matter of contract law, the contract can be terminated in part and whether there's a suit for breach of contract as opposed to a suit to recover the royalties. And Your Honor, as a matter of contract law, this contract cannot be terminated in part by metabolite. It can be terminated in whole by metabolite, but it is abundantly clear that metabolite has not done that. The court made that finding on the undisputed facts at Addendum 23. But do we need to determine at that point whether or not any implication of patent law is involved in the termination of the contract? Your Honor, no. That's the answer to your question. The patent law question arises again because of the intermingling of the jury verdict, which LabCorp wants to overread. We would submit that figuring out what the jury actually decided, that LabCorp did willfully infringe the patent and therefore owed damages to CTI, and that LabCorp did willfully breach the contract, and therefore owes royalties to metabolite. Untangling those two things in some inartfully worded special verdict forms requires some knowledge of the patent law doctrines. That is, the automatic termination available to a patent license holder, which Judge Dyck, I would respectfully submit, does not translate over into the state law license contract. There, the termination rights have to be defined by reference to the contract, which was not followed by LabCorp. Therefore, the contract remains in force as evidenced by their payment of urine-based royalties throughout this period to which they've had no response. Thank you, Mr. Perry. We'll restore two minutes of rebuttal time. Thank you. Mr. Castanis. It's Castanis, Your Honor. Good morning. That's quite all right. Good morning, and may it please the court. Ordinarily, I'd start with the jurisdictional issue, but since the court has been asking about the merits, I'll start with the termination issue and then turn to the jurisdictional issue at the end, although I think Judge Moore has made the exact same point that we would make with regard to jurisdiction. Why don't we actually discuss the jurisdiction? Let's go to the jurisdictional issue first. Are you familiar with the U.S. vows against Gray? Yes, Your Honor. And so why isn't that case in point on the jurisdictional point? First of all, I'm familiar with it in general. I don't remember the specific facts of the case as I stand here today. What I think and what we believe is the jurisdictional concern in this case is the one that Judge Moore pointed out earlier, that there was not and has never been a substantial disputed question of patent law at the outset of this case. So was your original pleading then a Rule 11 violation since apparently you claimed there was a disputed one? Oh, no. Our original pleading pled that jurisdiction was based on diversity with an amount of controversy because it was... But you also, didn't you allege that there was a dispute over whether or not the licensed assays fell within the patent claims? Well, I'm not sure where Mr. Perry was referring to there. I'd be happy to have the court point me to where you're seeing that. If there's a dispute with regard to the licensed assay, it's not one that necessarily depends on patent law because it could very well be resolved by simply determining that the license agreement with regard to this assay is at an end and was viewed to be at an end by the first trial. Well, wasn't the first trial really a determination of infringement? An infringement essentially has been established? That's exactly right. Just a question of damages at this point under the contract or outside of the contract? I'm sorry, the last part of your question... Whether or not you terminated the contract? Well, the question in this case is whether the contract was in fact terminated in the first case. In the first case, right. The question of whether or not the Abbott assay, and I think it's important to note, it's not every homocysteine assay that was found to be terminated. It was specifically the Abbott assay. And if you look at the original complaint for the Fourth Amendment complaint, which has been supplied to the court, it's what the parties refer to as assay number 706994. It is for that assay for which this was terminated. The urine assay, by the way, is an entirely different assay that we view as a red herring in this case with regard to the merits. So that assay is only for blood assays? That's right. That's right. Do you agree that if there had been no determination in the first case with respect to these assays coming within the scope of the contract that metabolite case would have depended on a substantial issue of federal law? If there had been no determination in the first case that the Abbott assay was an infringing assay? Yes. That might make the difference. It certainly seems to me that if we had to litigate this in this case, that it would take it out of that Franchise Tax Board, Speedco, and the Grable and Sons type of case. So what case says that if there's an element of the clause of action that depends on federal law that federal jurisdiction's defeated because that issue is conceded? I've looked at some of these Supreme Court cases. They don't suggest that the fact that the issue gets to be undisputed between the parties somehow affects the federal jurisdiction. What case says that? Well, I think if you look at Franchise Tax Board says that it has to be a substantial disputed question of federal law. This court's decision in Speedco says it has to be a substantial disputed question of federal law. What case says that if it's not disputed there's no jurisdiction? If it's part of the clause of action, if the issue is part of the clause of action, which it seems to me you can see that it is here, if it's part of the clause of action, how can the fact that it becomes undisputed defeat federal jurisdiction? Well, I think then you have to read the language out of the Franchise Tax Board decision from the Supreme Court that says disputed. You have to read it out of Speedco where it said disputed, and you have to read it out of the Supreme Court's decision in Grable and Sons. But the problem is there are other Supreme Court decisions that say the fact that it isn't disputed doesn't deprive you of jurisdiction. I'm not sure that as I stand here, Your Honor, that I know of one of those cases. But with regard to the jurisdictional issue, we have flagged it for the court because this court has made very clear in previous decisions that it takes umbrage when the parties do not raise jurisdictional concerns with regard to the case being before this court. What about your final pretrial order where you actually say, quote, doesn't fall within the claims of the 658 patent? I'm sorry, can I go again? Final pretrial order where you contended that this doesn't, quote, fall within the claims of the 658 patent. Do you have the A side for that? I'm sorry, Your Honor. 822095. Or 088. Either one. I think the answer, Your Honor, to that is that it is possible that the court could have had to decide that in this case. You just said we already decided it. Again, Your Honor, this has been a case, as the argument before me has shown, with a lot of moving parts and a lot of shifts in position. We have to decide whether there was a dispute over this issue. If you are putting the issue in dispute and saying there is a dispute over the issue at the trial court, it kind of makes it difficult for you to stand in front of us and say there was never any dispute over this issue. Well, as Mr. Perry said, it might not have been a good argument. If it was an argument and it is enough to get this court jurisdiction, we're happy to have this court take it up on the merits. We're not resisting this court's jurisdiction with the suggestion made by the other side that somehow or another this telegraphs a weakness in the merits. Because I want to make sure that if the court is going to decide this case on the merits, rather than transfer it, that the court understands very clearly what Judge Weinshank did in this case. But a substantial portion of your brief was based on no lack of jurisdiction. Oh, that's true. It should have been transferred. And that's what you're asking us to do, basically, in a red brief. Well, we certainly have also reached the merits in case we're wrong on that. We certainly have briefed the merits as well. I mean, I'm not running away from the jurisdictional argument. We still think that under Franchise Tax Board and Speed Co., that this court doesn't have jurisdiction, that this is a state law contract case that should go to the 10th Circuit. We think that when you look at the inverse of the declaratory judgment action that we filed, which is what Speed Co. says, then you see a case that has no substantial disputed question of federal law at the outset. If we're wrong, I want to make sure that we argue the merits here. Because this court will then decide the merits. And with regard to the merits, the district court was correct. And the district court was correct because, as Judge Dyke asked my colleague on the other side earlier, we know something was terminated from the first case. The question is, what was terminated? And the answer, as Judge Weinshank held, was that the license agreement itself was terminated with respect to the Abbott assay. The parties have sometimes used the term homocysteine-only assay to refer synonymously to the Abbott assay. But it doesn't mean that every homocysteine assay of any kind, including the urine ones, it was terminated. That's not been our position. It's never been our position. Now, when you look at this license agreement, you see in Article IV, as Mr. Perry's pointed out, two termination clauses. Metabolite likes to point out that they could only terminate the agreement as a whole under 4.03. Well, that's not very helpful to them because if it's terminated as a whole, then I don't know why we're here. I think that ends the case right there. But what they were allowed to do at the first trial was to terminate on the assay basis. And this is distinct in the termination clause of the agreement from the way that the license is granted. What Section or Article I and Article II of the license agreement say is that metabolite will grant to our predecessor, Hoffman LaRoche, a license to certain what are now called know-how rights. And by the way, you can scour the record of the first trial, and you'll never see a reference to the separate set of rights before the jury verdict. And then they're granting a sub-license to the patent rights. And that's an important point, Your Honor, because Mr. Perry stood here and said it was CTI who terminated this agreement. CTI didn't terminate it, and it couldn't have terminated it because it was an agreement only between metabolite and now LabCorp. CTI was not a party to the agreement. It did not have any termination rights under that agreement. And with every aspect of the first trial, it's consistent. Because it was an exclusive license, it had the right to sub-license? It did, yes. And you'll see that in the appendix. That was added to the agreement that it had with UPI, which was the predecessor to CTI, by a letter agreement between them because UPI, CTI's predecessor, thought it would be beneficial to be able to have metabolites sub-license this out to Hoffman and Roche. So what you end up with is what could be terminated under the contract? Well, the answer is either the entire agreement, this agreement as is used in 4.02 and 4.03, or this agreement with respect to a particular assay, which is 4.02. This is what Judge Weinshank found compelling and why she granted summary judgment from LabCorp. In looking at the contract, she realized that the parties had agreed. Yes, there were different types of rights being licensed, but there was a singular license agreement. And it could be terminated either across the board at metabolite's election, or it could be terminated using the 4.02 methodology on an assay-by-assay basis. That's what LabCorp, or that's what Metabolite did. That's the theory they put forth at the prior trial. We say that if we're wrong on the law, then that's at least judicial and collateral estoppel because of what the jury verdict actually said and what they actually argued both to this court and to the jury in the prior case. But we think that the agreement itself, as a matter of law, says you can't terminate on this some-rights-but-not-other-rights basis. In fact, the provisions in the license agreement that Mr. Perry has invoked, which are in Article I and Article II, point out that, yes, we are licensing know-how rights and sublicensing patent rights. And we're going to pay a certain amount for the so-called know-how rights and a certain amount for the patent rights. But when you go to Article IV, you don't see that sort of division anywhere. Quite the contrary. The parties anticipated that the only terminations would be across the board, either with regard to an assay or with the agreement entirely. And let me make sure that the court understands why this strategy had to be followed by Metabolite, not just because of the contract. But they needed to terminate at least the patent aspect of it so that they could get enhanced damages, which they got in excess of $1 million. They got attorney's fees in excess of $1.1 million. And they got an injunction against LabCorp. None of those things would have been available had they sued on the licensing. I'm a little confused about your characterization of these termination provisions of the agreement, which are on 2787. It's true that LabCorp or LabCorp's predecessor under 402 can terminate with respect to a particular licensed assay. But I don't see that under 403 that Metabolite has the right to do it on assay basis. No, and if you follow the contract, literally what 4.03 says is exactly what this court said in the prior opinion, which is in the case of a breach, you have the election. In the case of a material breach, non-breaching party has the election to follow the contract or terminate it. Well, so the termination here would depend on general contract law, not the right being exercised by Metabolite under 4.03 of the contract. Well, I think that's right. Although, I think if you look at the way that the case was tried, the first case was tried, you see that what they did was terminate it with regard to the assay. They borrowed the 4.02 contract. I understand the argument that that's what the first trial shows that they did. But what I'm reacting to is the suggestion that somehow 4.03 gave them the right to terminate it on an assay by assay basis. I don't see that in 4.03. Well, I don't see that either in 4.03. And so they were able to get something that maybe the contract didn't allow them. But that's the way the first case was tried. What we do know is that it didn't hide off know-how rights from patent rights. And indeed, as I pointed out before with regard to the contract, the contract itself doesn't suggest that the parties wanted the severability of termination rights in the way that Metabolite now argues. Now, let me just go back to what this case might have looked like had Metabolite been able to legally put forth this theory at the prior trial. Because if it had been able to argue this partial termination, Metabolite and CTI, represented by the same counsel, would have been arguing, well, the agreement is terminated with regard to CTI and the patent rights, so we can sue on the patent. But the same act of breach that was a termination and that was argued by Metabolite to be the termination, the non-payment of license fees, that same act was simultaneously not a termination with respect to the know-how rights. This would have given LabCorp, our client, a powerful argument against the willfulness ruling that the jury ultimately made. How can you say that we were unreasonable and acting in the sort of bad faith that it took to get a willfulness determination at that time when we at least had a good faith basis for believing that we were licensed? Remember, we thought our argument in the first case was that we were under the license, and so they couldn't bring the patent infringement suit. We wanted to continue, but we lost. And now we're accepting that and moving on. Before you sit down, let me give you a citation of one of these Supreme Court cases that seems to suggest there doesn't need to be an actual dispute about federal laws as long as it's an agreement that the cause of action was the Thurston case, which is 460 U.S. 433. I appreciate that, Judge Dike. And the only thing I can say about that without having read Thurston, at least having read it in recent memory, is that it's hard to reconcile that holding, as you've described it, with what Franchise Tax Board, Grable, and this Court's decision in Speedco say about there needing to be a substantial disputed question. And I guess I would point out at that point as well that the Supreme Court's decisions in Franchise Tax Board are not disputed. But you would agree that it doesn't have to be disputed at the time it gets up to the Court of Appeals. It had to be disputed and measured as of the time of the pleadings. Right. And I think, Your Honor, if you look at our complaint, and more importantly, the mirror image complaint to the declaratory judgment complaint that we brought, you won't see that this case necessarily depended on that disputed fact. I just want to make sure that you're not misrepresenting the view of Speedco and Tax Franchise. You're not suggesting that the dispute has to continue throughout the proceedings and all the way up to here. You're just saying that both of those courts held there had to be a dispute at the time of the pleading. The general rule, as I understand it, Judge Moore, is that you evaluate whether or not there's jurisdiction at the time of the pleading. That's the Freeport-Moran case from the Supreme Court, as well as some others as well. But I think if you look at that pleading, you will not see in the mirror image of our well-pleaded complaint the hypothetical counterclaim that Speedco says to look at, you won't see that this case necessarily turns on a substantial disputed question of patent law. It's a lot like Bonzel, where the other side said, to be blunt, this is not a patent case. I've lost my train of thought on which other case it's like. But the bottom line is that the patent holder is not even a party to this case. That ought to tell you a lot about how much of a patent issue there really is in this case. Unless the court has further questions, thank you. Thank you very much. Mr. Perry, you have two minutes. Thank you, Your Honors. Mr. Castagne has said that if we follow the contract literally, there is no termination. Judge Dyke then said, well, we have to fall back on general contract principles. He agreed. Those principles are stated in the New Jersey cases, cited in the reply brief at page 9, and this court's prior opinion at page 1370, which all say that we could only terminate the entire agreement. So general contract principles say no termination. Therefore, the only argument. But the problem with that is this, that both parties have treated it as though there could be a partial termination of the agreement with respect to the patent license. Your Honor, as to the patent license, that's exactly right. And I can do little better than to recommend to the court, the district court's absolutely thorough and correct analysis of this question the first time she looked at it, of what the jury verdicts meant. It's in the record at page A2122 and 21123. That's the September 06 opinion where she correctly understood that the jury necessarily, and we're dealing with collateral estoppel here, it's what the jury had to decide, only a partial termination of the patent license, which is permitted under patent law, and no termination, but a breach of the know-how license, which is what all of the state law contract principles require. That should be enough to end this case. That is demonstrated by this urine versus serum thing. Mr. Castanis' only response is, the Abbott assay stands alone. That's wrong. If you look at 4.03 and all the other provisions of this contract, the licensed assays are defined. There are four of them. Homocysteine, methylmalonic acid, methyl citric acid, and cystathione. Those are the four assays covered. Homocysteine is indivisible. Their continued payment of royalties on the urine-based homocysteine assays demonstrates, as a matter of undisputed fact and law, there is no termination. They are in continued breach. There is absolutely no way to divide the contract. They concede that. The terms of this contract require payment of royalties from the entry of the judgment in the last trial through August 21, 2007, plus 60 days under the contract. That amount has been accounted for under the stipulated stay order. It's a matter of math to determine it. The remand would only be to add up those dates and apply interest to it. And that's what the court should order. Thank you very much. Thank you. The case is submitted.